SARTAIN, Judge.
This is a suit by plaintiff, Charles R. Stewart, against his employer, Batson Lumber Company, in which he seeks workmen’s compensation benefits based on total and permanent disability due to a back injury he received during the course and scope of his employment as a laborer for defendant. Judgment was rendered by the trial court awarding plaintiff compensation benefits of $49.00 per week from the date of his injury, November 29, 1971, up to December 1, 1972. From this judgment defendant has suspensively appealed and plaintiff has answered the appeal.
Defendant contends that the trial court erred in awarding compensation for disability beyond that period for which compensation had already been paid. Plaintiff by answer to the appeal seeks an award of total and permanent disability benefits.
The record shows that at approximately 10:00 A.M. on November 29, 1971, plaintiff sustained an injury to his back while attempting to lift and remove a large board from a machine on the premises of the defendant. Plaintiff was in the course and scope of his employment and performing his duties as a tiller and strip catcher at the time of the accident. Plaintiff testified that when he lifted the board he felt something pull in his back and within about fifteen minutes he began to experience pain in his back. Plaintiff reported the .incident to his supervisor and was referred to Dr. J. DeLoach Thames in Hammond, Louisiana.
Dr. Thames, a general practitioner, testified that he examined plaintiff around noon on the day of the accident. He found muscle spasm present in plaintiff’s lower back and tenderness over his lumbo-sacral region on flexion of the spine and straight leg raising. X-rays were taken of plaintiff’s back but were negative for bone injury. Dr. Thames prescribed muscle relaxers and pain relievers. From November 29, 1971 through December 22, 1971 plaintiff received numerous diathermy treatments to his back under the direction of Dr. Thames. Plaintiff continued to complain of back pain and Dr. Thames referred him to Dr. Louis F. Matta, an orthopedist in Covington, Louisisana. Dr. *543 Thames stated that it was his opinion that plaintiff was suffering from a lumbar strain. He last saw plaintiff on December 17, 1971.
Dr. Louis F. Matta testified that he saw plaintiff on three occasions. He first examined plaintiff on December 14, 1971 when plaintiff was referred to him by Dr. Thames. Dr. Matta stated that on this first visit plaintiff told him that he had been receiving heat treatment from Dr. Thames but that his condition had not improved. Plaintiff told Dr. Matta that he was experiencing constant pain across his low hack and that he was having difficulty in raising from the bending position, but he denied any pains or numbness of the lower extremities. Dr. Matta stated that plaintiff was able to undress himself with no great difficulty. Plaintiff ambulated well and exhibited a good range of motion of his back in all quadrants. No muscle spasm was found but plaintiff did complain of pain when the midline and the low back was pressed with the thumb. X-rays were taken and they failed to reveal any evidence of fracture, dislocation or subluxation. Dr. Matta described several inconsistencies which he found during this examination. Plaintiff’s legs could be flexed to the hip at ninety degrees in the sitting position without complaints of pain but could only be flexed to forty-five degrees in the supine position at which point plaintiff would complain of pain in his lower back region. Dr. Matta testified that there is no anatomical explanation for these inconsistent responses. As a result of this examination Dr. Matta concluded that plaintiff has sustained a mild lumbosacral strain and needed no further treatment. This recommendation was made known to plaintiff and his employer who discontinued compensation payments in February of 1972.
Dr. Matta examined plaintiff again on August 1, 1972 at which time plaintiff complained of continuing pain in his lower back region. Plaintiff told Dr. Matta that the pain was radiating down his left leg to the ankle region. Dr. Matta stated that at this examination plaintiff was able to undress without difficulty and ambulated well. There was no weakness of his leg muscles. No lumbar muscle spasm was present and x-rays revealed no fractures or subluxations. The straightleg raising test and pelvic flexion test failed to elicit any complaints of pain in the lower extremities or low back region. Again in this examination plaintiff exhibited the inconsistency of being able to flex his legs to ninety degrees in the sitting position without pain but could only reach his knees during flex-ion in the standing position. Dr. Matta concluded that plaintiff was suffering no residual disability from the accident of No-bember 29, 1971.
Dr. Matta examined plaintiff for the third time on November 7, 1972. Plaintiff again complained of low back pain with pain radiating down his left leg. The results of this examination were basically the same as those found in Dr. Matta’s two previous examinations. Plaintiff once again exhibited the inconsistency of not being able to bend forward beyond forty-five degrees in the standing position without pain but could raise his legs to ninety degrees in the sitting position without pain.
Plaintiff attempted to return to work on one occasion in December of 1971 following his first visit to Dr. Matta, but stated that he left after about two hours due to severe back pain. He then went to the Lallie Kemp Hospital in Independence, Louisiana. The records from the Lallie Kemp Hospital concerning plaintiff’s condition are part of this record. Plaintiff was given pain medication and several x-rays were made at Lallie Kemp. Plaintiff was then referred to Charity Hospital in New Orleans.
Dr. Henry LaRocca, an orthopedic surgeon, testified that he first saw plaintiff on February 28, 1972 in New Orleans. Dr. LaRocca’s initial examination revealed the presence of muscle spasm in the paraverte-bral muscles and a reduction in cutaneous *544 sensation in the lower left extremity. The straight leg raising test was positive on the left with pain in the back and leg when the forty degree position was reached. Based upon this examination Dr. LaRocca felt that plaintiff had a herniated lumbar inter-vertebral disc. Dr. LaRocca urged hospitalization for assessment and treatment.
Plaintiff was hospitalized in the Charity Hospital in New Orleans on March 3, 1972. A myelogram was done, but was normal. Plaintiff was fitted with a body jacket cast and discharged on April 4, 1972. Plaintiff returned after several weeks and the cast was removed. Plaintiff returned to Charity Hospital on May 4, 1972 and was placed in a pantaloon spica cast. He was discharged on May 10, 1972. The spica cast was removed after approximately two weeks.
Dr. LaRocca testified that he last saw plaintiff on June 12, 1972 and his examination at that time revealed that plaintiff had a full range of body motion without significant pain and there was no paravertebral muscle spasm. No demonstrable muscle atrophy was found and no motor weakness was noted. Dr. LaRocca stated that as of this examination plaintiff’s condition had improved.
Plaintiff was re-admitted to Charity Hospital in New Orleans on June 26, 1972 and remained hospitalized until July 20, 1972. A discogram was performed on July 11, 1972. The discogram revealed evidence of degenerative disc disease at levels L-3, L-4 and L-5. Based on the results of this discogram a surgical spine fusion was recommended. However, plaintiff did not return for the surgery following this period of hospitalization.
On September 26, 1972 Dr. Kenneth E. Vogel, a New Orleans neurosurgeon, examined plaintiff. Dr. Vogel testified that at the time of his examination plaintiff was - experiencing moderate lumbosacral pain. There was a limitation of motion to forward flexion at forty-five degrees. There was also a moderate left paraspi-nous muscle spasm to palpitation. The straight-leg raising test was positive at forty-five degrees on the left and fifty degrees on the right. Plaintiff was experiencing numbness of the entire left side of his body. Dr. Vogel stated that it was his impression that plaintiff was suffering from a herniated lumbar disc. Dr. Vogel further testified that plaintiff was experiencing an anxiety reaction concerning his injury. Dr. Vogel prescribed medication primarily to aid plaintiff in resolving this anxiety reaction.
Dr. Vogel saw plaintiff again on October 5, 1972 and testified that the numbness of the entire left side of plaintiff’s body had resolved and he was experiencing only numbness of the left leg. Dr. Vogel attributed this improvement in plaintiff’s condition to partial resolution of plaintiff’s anxiety reaction. However, Dr. Vogel stated that it was still his impression that plaintiff had a herniated disc.
Dr. Vogel stated that he was aware of the results of the Charity Hospital myelo-gram and discogram. However, Dr. Vogel testified that he was unfamiliar with the reports of the other physicians concerning plaintiff’s condition and he had not seen any of the x-rays.
After trial was held in the District Court the case was left open for the testimony of Dr. Thomas B. Flynn, a Baton Rouge neurosurgeon, who examined plaintiff on December 1, 1972. Dr. Flynn’s testimony was given by post-trial deposition on December 20, 1972.
Dr. Flynn testified that at the start of his examination plaintiff had to be assisted in removing his clothing and shoes. Dr. Flynn stated that examination revealed normal leg measurements, both for length and circumference in each of plaintiff’s legs. There was no muscle spasm in the lower back area and there was no tilting of the pelvis. Plaintiff was able to stand erect and flex forward a full ninety degrees. There was no limitation of motion in plaintiff’s back. Dr. Flynn testified *545 that plaintiff’s reactions to the straightleg raising test were inconsistent. While lying flat plaintiff could elevate his legs only up to ten degrees without pain but while standing and leaning forward he could flex his legs a full ninety degrees without pain. Dr. Flynn found no evidence of weakness or wasting in either of plaintiff’s legs and there was no muscle weakness in the back area. The superficial reflex tests were normal indicating no evidence of spinal cord damage. Dr. Flynn stated that the tests to check loss of sensation showed no abnormality. At the conclusion of the examination Dr. Flynn stated that he told plaintiff he could find nothing wrong with him and that plaintiff could dress himself without assistance. Dr. Flynn testified that plaintiff then promptly dressed himself and left.
As to the conclusions drawn by Dr. Flynn concerning plaintiff’s condition based on his examination, Dr. Flynn testified that he was of the opinion that plain- ’ tiff had suffered a lumbar strain on November 29, 1971. Dr. Flynn stated that plaintiff thus experienced back and hip pain and was probably still experiencing some pain when he went to the Lallie Kemp Hospital in December of 1971. It was Dr. Flynn’s opinion that the subsequent repeated trips to Charity Hospital, the use of the body cast, and finally the painful lumbar discogram caused plaintiff to begin to think he really had something horrible and it really scared him. It was Dr. Flynn’s opinion that the injection of the dye at “L-5” during the discogram was made about the nerve root rather than into the disc itself thereby causing pain to the plaintiff. Dr. Flynn stated that he does not believe plaintiff is a malingerer but that plaintiff is convinced that he does have back and leg pain due to a severe anxiety reaction. Dr. Flynn stated that his examination revealed that nothing was wrong with plaintiff’s back and he further stated that plaintiff should return to work in order to resolve his anxiety reaction. According to Dr. Flynn the pain which plaintiff is experiencing due to the anxiety reaction would disappear once plaintiff returned to work and convinced himself that he no longer has anything wrong with his back.
Dr. Flynn had before him all of the x-rays previously made and additional x-rays made on December 1, 1972. He stated that they were all essentially normal. He also had the results of the myelogram and discogram before him. It was Dr. Flynn’s opinion that the discogram did not evidence any ruptured discs in plaintiff’s back. Dr. Flynn also stated that the chances of a patient having three bad discs disclosed by a discogram and yet having a normal myelogram were negligible. Dr. Flynn testified that all of the reports and studies concerning plaintiff’s condition at previous examinations actually confirmed his own opinion.
Plaintiff testified concerning his injury and stated that he is not presently able to work because of the pain in his back. He stated that he is unable to bend or lift without constant pain in his back and leg.
Plaintiff’s elderly uncle, Mr. Will Harrell, testified that he has known plaintiff all of his life and that prior to the accident he never complained of back pain. Mr. Harrell stated that since the accident plaintiff has been unable to do anything.
In awarding compensation benefits to plaintiff, the trial court, in written reasons for judgment, stated as follows:
“The court feels that there may have been some question as to plaintiff’s disability as late as Dr. Matta’s examination of August 1, 1972. In order to give liberal construction to our compensation law and to give plaintiff the benefit of every doubt, the Court will award compensation up to December 1, 1972, at which time the Court feels all doubts were resolved by Dr. Flynn’s report, and that the plaintiff was able and should have returned to his duties.”
We do not find the conclusion reached by the trial judge to be manifestly erroneous. In our opinion the evidence *546 clearly preponderates to the effect that plaintiff did not sustain a ruptured disc.
While it was Dr. Matta’s original and consistent opinion that plaintiff has suffered only a lumbosacral strain and not a ruptured disc, there is evidence in the record supporting the finding that following Dr. Matta’s first examination on December 14, 1971, plaintiff was still experiencing pain and discomfort in the lumbo-sacral area. This prompted him to seek treatment at the charity hospitals in Independence and New Orleans as above described. Plaintiff is entitled to recover compensation for that period of time which the medical evidence dictates that he is disabled. This is what the trial judge did in awarding plaintiff compensation up to the date of Dr. Flynn’s examination.
Much of the medical evidence in the record relates to the merits and/or demerits of the use of discography as an aid in determining whether an individual has sustained a ruptured disc. It is evident that members of the medical profession, particularly orthopedists and neurosurgeons, are divided in their opinion as to the merits of this procedure. Be that as it may, we are impressed with the testimony of Drs. Mat-ta and Flynn relative to their opinion that plaintiff did not sustain a ruptured disc.
By Dr. Matta:
“Q. Dr. Matta, referring to the myelo-gram and assuming that a myelo-gram is 80% reliable and that this man may have had three herniated discs, wouldn’t it be very highly unusual that one of the three herniated discs would not have showed up on a myelogram ?
“A. I • do agree with you, Mr. Mentz. It is also on the order of almost astronomical.” (Emphasis ours)
By Dr. Flynn:
“Q. Dr. Flynn, you stated that you had had the benefit of Dr. Vogel’s report which showed his impression as an acute anxiety reaction on— his report of October 2, 1972; would that sort of condition have any effect on the results that you might obtain on a discogram ?
“A. I would say this. Lumbar discography as a test by neurosurgeons in general and by myself in particular has largely been abandoned in recent years as a diagnostic tool in the evaluation of suspected lumbar disc ruptures, the reason being that an abnormal disc pattern on x-ray when, the disc is injected does not necessarily mean a clinically significant herniation or one that is causing discomfort. The lumbar discogram is much different from a test such as a lumbar myelogram in that interpretation of the discogram is largely of a subjective nature and depends on the patient’s reaction to the dye injection. In other, words, when the dye is injected in the disc the patient is asked whether or not the injection reproduces his discomfort. And this is of prime consideration. The x-ray picture made of the injected disc is of secondary importance. And in a patient who has some problems that would make him an unreliable reporting witness or patient, then the discogram itself would be unreliable.
“Q. Well, now, as compared to a mye-logram — is a myelogram customarily used now with neurosurgeons?
“A. Yes, sir, we perform a lumbar myelograph — I have a regular speech about lumbar myelography which I give my patients. Lumbar myelography is 75 to 80 percent diagnostically accurate. It will miss 25 — approximately 25 percent of disc herniations. It is therefore *547 proper to say that it is possible to have a disc herniation and a normal lumbar myelogram.
“Q. Well, assuming that a person has three herniated discs what would the chance be of the myelogram failing to turn up at least one of them?
“A. Yes, sir. Negligible. And I will say at this point that not only do I not think — or, is it my opinion that this patient does not have a ruptured disc, it would be my firm conviction that neither of the tests done on him nor any of his examinations has in any way demonstrated the presence of multiple disc ruptures. And he is — in a 22 year old healthy man who has had no prior history of back difficulty, the chance statistically of finding three clinically significant herniated lumbar discs is just infinitesimal — with no history of back trouble. In dealing with this patient, I’ll just pick myself since I’ve been in practice, and since 1967 I’ve seen one patient under age 30 with three bad lumbar discs, and this was a patient that had a congenital abnormality in her back who had had symptoms for 10 or 12 years. Never another patient.” (Emphasis ours)
In essence, a decision in this cause boils down to an evaluation of the conflicting testimony given by the various experts. The burden of proof rests with the plaintiff and we are constrained to agree with the trial judge who held that plaintiff had not borne this burden.
Accordingly, for the above reasons, the judgment of the District Court is affirmed at appellant’s costs.
Affirmed.